UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 21-162-01
vs.                                )
                                   )
GLEN WES LEE CROY,                 )  August 9, 2021
                                   )  9:28 a.m.
              Defendant.           )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF PLEA COLLOQUY**
**BEFORE THE HONORABLE JUDGE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT CHIEF JUDGE**

*(Parties appearing via videoconference and/or telephonically.)*

<u>**APPEARANCES**</u>:


FOR THE GOVERNMENT: CLAYTON HENRY O'CONNOR
                    DOJ-CRM
                    1301 New York Avenue, NW
                    Washington, DC 20530
                    (202) 616-3308
                    Email:  clayton.oconnor@usdoj.gov


FOR THE DEFENDANT:  KIRA ANNE WEST
                    712 H Street, NE
                    Washington, DC 20002
                    (202) 236-2042
                    Email:  kiraannewest@gmail.com


ALSO PRESENT:       ANDRE SIDBURY, Pretrial Agent


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

*This hearing was held via videoconference and*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                        **P R O C E E D I N G S**

2                  THE COURTROOM DEPUTY:  Matter before the Court,

3       Case No. 21-162-01, United States of America versus Glen Wes

4       Lee Croy.

5                  Counsel, please state your names for the record,

6       starting with the government.

7                  MR. O'CONNOR:  Good morning, Your Honor.

8       Clay O'Connor for the government.

9                  THE COURT:  Good morning.

10                 MS. WEST:  Good morning, Your Honor.

11      Kira Anne West for Mr. Glen Wes Lee Croy --

12                 THE COURT:  Okay.

13                 MS. WEST:  -- who is present.

14                 THE COURT:  Yes.  Good morning, Ms. West.

15                 Good morning, Mr. Croy.

16                 Are you having any difficulty hearing or seeing us

17      this morning?

18                 I can't hear you.

19                 THE COURTROOM DEPUTY:  He's muted.

20                 THE COURT:  You are muted, Mr. Croy.

21                 Could you please unmute.

22                 THE DEFENDANT:  Yes, ma'am.

23                 THE COURT:  All right.

24                 Your video seems to be going -- jumping around.

25      Are you walking?

1          THE DEFENDANT:  I am outdoors.  I am at my job

2     site.  I had to get everybody started, so I am here.  I am

3     just --

4          THE COURT:  You are just, what?

5          THE DEFENDANT:  I am here.  I can hear everything

6     perfectly, and the video should be fine.  I will try not to

7     move around too much.

8          THE COURT:  Please do not move around too much.

9     If I need to have you settle down, I can just bring you

10    right to D.C. and do this in person.

11         Do you understand that?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  So settle down.

14         THE DEFENDANT:  Okay.

15         THE COURT:  All right.  I understand the purpose

16    of Mr. Croy's appearance here today is to enter a plea of

17    guilty to Count 4 of the information charging him with:

18    Berating, demonstrating, or picketing in the Capitol

19    Building, in violation of 40 U.S.C. Section 5104(e)(2)(G),

20    which is a heavy Class B misdemeanor.

21         Is that correct, Ms. West?

22         MS. WEST:  Yes, Your Honor.

23         THE COURT:  All right.  Mr. Croy, do you agree,

24    after consultation with your counsel, to participate in

25    today's plea hearing using videoconference technology rather

1  than being physically present in the courtroom?

2  THE DEFENDANT:  Yes, ma'am, I do.

3  THE COURT:  All right.  The defendant seeks to

4  resolve this case with a plea promptly, without waiting for

5  an unknown period when persons may be fully safe traveling

6  to D.C. and being physically present in the courtroom.

7  Therefore, the Court finds, as required by the CARES Act,

8  when proceeding with a plea hearing, using video or audio

9  conferencing, that the interests of justice are served by

10  avoiding further delay in hearing the defendant's change of

11  plea today remotely.

12  Ms. West, do you have any other findings, under

13  the CARES Act, to make to explain why the plea hearing is

14  being done by videoconference rather than having Mr. Croy

15  travel to D.C. to appear in court in person?

16  MS. WEST:  No, Your Honor.  I believe you have

17  covered it.

18  THE COURT:  And, Mr. O'Connor, what about you?

19  Any additional findings to make?

20  MR. O'CONNOR:  No, Your Honor.  Thank you.

21  THE COURT:  I would like to remind anyone

22  listening to the hearing over the public teleconference line

23  that, under my Standing Order 20-20, recording and

24  rebroadcasting of court proceedings, including those held by

25  videoconference, is strictly prohibited.  Violation of these

1    prohibitions may result in sanctions, including removal of

2    court-issued media credentials, restricted or denial of

3    entry to future hearings, or other sanctions deemed

4    necessary by the presiding judge.

5            All right.  Mr. Croy, during the plea hearing, I

6    am going to be asking you a number of questions to ensure

7    that you understand your rights and the rights that you will

8    be giving up, and that your guilty plea is voluntary, and

9    you understand what you are doing here today.

10           So if at any time I ask you questions, you want me

11   to repeat the question, let me know.  If I ask you a

12   question that you don't feel that you understand completely

13   also let me know; and I will give you an opportunity to talk

14   to Ms. West.

15           Do you understand?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  All right.  Before we proceed any

18   further, I will ask my courtroom deputy to administer the

19   oath to Mr. Croy.

20           THE COURTROOM DEPUTY:  Yes, Your Honor.

21           Mr. Glen Wes Lee Croy, would you please raise your

22   right hand.

23           (Whereupon, the defendant was sworn.)

24           THE DEFENDANT:  I do.

25           THE COURTROOM DEPUTY:  Thank you, sir.

1       THE COURT:  Okay.  Mr. Croy, you can put your

2   right hand down.

3       You are now under oath.  This means, if you do not

4   answer my questions truthfully, you could be prosecuted for

5   perjury or for making a false statement; and any false

6   answers you give here today could be used against you in

7   that prosecution.

8       Do you understand?

9       THE DEFENDANT:  Yes, ma'am.

10      THE COURT:  What is your full name, Mr. Croy?

11      THE DEFENDANT:  Glen Wes Lee Croy.

12      THE COURT:  So "Wes" and "Lee" are two middle

13  names that you have?

14      THE DEFENDANT:  Yes, ma'am.

15      THE COURT:  How old are you, Mr. Croy?

16      THE DEFENDANT:  46 years old.

17      THE COURT:  How far did you go in school?

18      THE DEFENDANT:  I got a GED.

19      THE COURT:  And do you have any difficulty reading

20  or writing?

21      THE DEFENDANT:  No, ma'am.

22      THE COURT:  Where were you born, Mr. Croy?

23      THE DEFENDANT:  I was born in Bend, Oregon.

24      THE COURT:  All right.  And where are you

25  physically right now, in what state?

1          THE DEFENDANT:  I am in Colorado.

2          THE COURT:  All right.  If you are not a U.S.

3     citizen, do you understand that conviction of this offense

4     may result in your deportation, exclusion from the U.S., or

5     denial of citizenship under our immigration laws?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Have you taken any alcohol or drugs in

8     the last 48 hours or any medicine that could affect your

9     ability --

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  -- to understand what you are doing by

12     entering a plea of guilty today?

13          THE DEFENDANT:  No, ma'am.

14          THE COURT:  Have you received any treatment

15     recently for any type of mental illness or emotional

16     disturbance or addiction to narcotic drugs of any kind?

17          THE DEFENDANT:  No, ma'am.

18          THE COURT:  Mr. Croy, are you completely satisfied

19     with the services of your lawyer, Ms. West, in this case?

20          THE DEFENDANT:  Absolutely.

21          THE COURT:  Do you feel that you have had enough

22     time to talk to Ms. West about the evidence in the case, the

23     charges against you, and the plea agreement in this case?

24          THE DEFENDANT:  Yes.  Yes, ma'am.

25          THE COURT:  Ms. West, do you have any question

 1      about Mr. Croy's competency to enter a guilty plea today?

 2                 MS. WEST:  None whatsoever, Your Honor.

 3                 THE COURT:  And, Mr. O'Connor, do you have any

 4      question about his competency?

 5                 MR. O'CONNOR:  No, Your Honor.

 6                 THE COURT:  I do find that Mr. Croy is responding

 7      appropriately to my questions, seems to understand what is

 8      going on here today; and, therefore, I find that he appears

 9      to be fully competent and capable of entering an informed

10      plea today, so I will proceed with the hearing.

11                 Mr. Croy, the next part of this hearing is where I

12      describe to you all of the constitutional rights that you

13      have.  And some of these questions may sound a little

14      legalistic so, again, if you want me to repeat any question,

15      let me know.  If you want an opportunity to talk to Ms. West

16      about any question that I ask you before you answer, again,

17      let me know.

18                 Do you understand that?

19                 THE DEFENDANT:  Yes, ma'am.

20                 THE COURT:  Okay.  You have a right to plead not

21      guilty to each of the charges in the information and to have

22      a jury trial in this case if you went to trial on all four

23      charges in the indictment.  And that's because some of the

24      charges in the indictment carry a term of imprisonment of up

25      to one year and are Class A misdemeanors which entitle you

1      to a jury trial.

2              If you went to trial on all the charges against

3      you and opted for a jury trial, 12 citizens from the

4      District of Columbia would sit in the jury box, listen to

5      the evidence presented by the government in this courtroom,

6      and decide whether or not the government had proven its case

7      against you beyond a reasonable doubt.

8              Do you understand that if you went to trial on the

9      entire information against you, you would have a right to a

10     jury trial?  Do you understand that?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  The specific charge to which you are

13     entering a plea of guilty, at 40 U.S.C. Section

14     5104(e)(2)(G), is a petty offense; and that kind of offense

15     is not, on its own, subject to a jury trial right.  But, by

16     accepting the government's plea offer, you are effectively

17     giving up your right to a jury trial on all four of the

18     charges in the information.

19             And on the petty offense to which you are entering

20     a plea of guilty, while you do not have a right to a jury

21     trial, you do have a right to a trial before a judge.

22             Do you understand that?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  And so by entering a plea of guilty to

25     the petty offense, you are giving up your right to a trial

 1    before a judge.

 2              Do you understand that?

 3              THE DEFENDANT:  Yes, ma'am.

 4              THE COURT:  If you had a trial, you would have the

 5    right to be represented by your lawyer at that trial and at

 6    every other stage of the proceeding, and, if necessary, have

 7    the court appoint counsel for you.

 8              Do you understand that?

 9              THE DEFENDANT:  Yes, ma'am.

10              THE COURT:  If you had a trial, you would have the

11    right, through your lawyer, to confront and cross-examine

12    any witnesses against you.

13              Do you understand that?

14              THE DEFENDANT:  Yes, ma'am.

15              THE COURT:  If you had a trial, you would have the

16    right to present your own witnesses, and the right to

17    subpoena witnesses to require them to come in to testify in

18    court in your defense.  You would also have the right to

19    testify and present evidence on your own behalf if you

20    wanted to.

21              Do you understand that?

22              THE DEFENDANT:  Yes, ma'am.

23              THE COURT:  You would not have to testify or

24    present any evidence at the trial if you did not want to

25    because you cannot be forced to incriminate yourself or

1    present evidence of your own guilt, and that cannot be used

2    against you.

3              Do you understand that?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  You are presumed by the law to be

6    innocent.  And if you chose to go to trial, it would be the

7    government's burden alone to prove your guilt beyond a

8    reasonable doubt.

9              Do you understand that?

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURT:  If you went to trial and were

12   convicted, you would have a right to appeal your conviction

13   of guilt to the Court of Appeals and to have a lawyer help

14   you prepare your appeal.

15             Do you understand that?

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  The plea agreement, dated July 30,

18   2021, that you have with the government sets out a waiver of

19   appeal rights on pages 4 through 5, at paragraph 9(d).

20             Under the terms of the plea agreement, you are

21   agreeing to waive -- and I quote:  The right to appeal the

22   conviction in this case on any basis including but not

23   limited to claims that, (i), the statute to which you are

24   pleading guilty is unconstitutional; and, (ii), the admitted

25   conduct does not fall within the scope of the statute.

1           And you are also agreeing to waive -- and I quote:

2     The right to appeal the sentence in this case including but

3     not limited to any term of imprisonment, fine, forfeiture,

4     award of restitution, term or condition of supervised

5     release, authority of the court to set conditions of

6     release, and the manner in which the sentence was

7     determined, except to the extent the Court sentences you

8     above the statutory maximum or guidelines range determined

9     by the Court, or you appeal on the basis of ineffective

10    assistance of counsel, as set out verbatim in the plea

11    agreement at pages 4 through 5, paragraph 9(d).

12           Do you understand that?

13           THE DEFENDANT:  Yes, ma'am.

14           THE COURT:  Do you have any questions you would

15    like to review with your lawyer about your waiver of appeal

16    rights as set out in the plea letter on pages 4 through 5?

17           THE DEFENDANT:  No, ma'am.

18           THE COURT:  Do you understand that you are also

19    giving up your right to collaterally attack your conviction

20    and sentence including but not limited to a habeas petition,

21    under 28 U.S.C. Section 2255, except in some limited

22    circumstances also set out in the plea letter on page 5, at

23    paragraph 9(e)?

24           THE DEFENDANT:  I understand.

25           THE COURT:  Do you want an opportunity to talk to

1    Ms. West about paragraph 9(e) in your plea agreement?

2              THE DEFENDANT:  No.  I think I understand it.

3              THE COURT:  You think you do?  Or do you want an

4    opportunity to talk to Ms. West about that paragraph?

5              THE DEFENDANT:  Sure.  I will talk to her real

6    quick.

7              THE COURT:  Okay.  We'll put you in a side room.

8              THE DEFENDANT:  Okay.

9              THE COURT:  Ms. West, I will give you two minutes;

10   and if you need more time, you will let me know.

11             MS. WEST:  Yes, Your Honor.

12             (Whereupon, counsel and the defendant confer.)

13             (Whereupon, the Court and staff confer.)

14             MS. WEST:  We're back, Your Honor.  Thank you.

15             THE COURT:  Okay.  Good.

16             So, Mr. Croy, I will ask you again:  Do you

17   understand that you are giving up your right to collaterally

18   attack your conviction and sentence including but not

19   limited to a habeas petition, under 28 U.S.C. Section 2255,

20   except in some limited circumstances that are set out in the

21   plea letter, at page 5, paragraph 9(e)?

22             THE DEFENDANT:  Yes, ma'am.

23             Kira had gone over that with me; I just didn't

24   remember the number.  But, yes, ma'am, I understand.

25             THE COURT:  All right.  Do you understand that if

1    you plead guilty in this case, and I accept your guilty

2    plea, you will give up all of the rights I have just

3    explained to you; there will be no trial?

4          THE DEFENDANT:  Yes, ma'am, I understand that.

5          THE COURT:  Do you understand that full discovery

6    has not yet been made available to you and that, by entering

7    a guilty plea, you will be agreeing to forego the right to

8    any further discovery or disclosures of information not

9    already provided at the time of entry of your guilty plea

10   today?

11         THE DEFENDANT:  Yes, ma'am.  I understand that.

12         THE COURT:  All right.  The government has

13   provided a document called "Statement of Offense," that

14   describes what the government would be prepared to prove at

15   trial about your criminal conduct, at least in part,

16   Mr. Croy.

17         Have you read this document called "Statement of

18   Offense," and discussed it fully with Ms. West?

19         THE DEFENDANT:  I have, Your Honor.

20         THE COURT:  And I'm showing you, on the video

21   camera, the last page, page 5, of the Statement of Offense.

22         Is that your signature, Mr. Croy?  Can you see

23   that?

24         THE DEFENDANT:  It is, Your Honor.

25         THE COURT:  And does this Statement of Offense

1    truly and accurately describe what you did in this case?

2           THE DEFENDANT:  It does, Your Honor.

3           THE COURT:  And did you, in fact, parade,

4    demonstrate, or picket in the U.S. Capitol Building on

5    January 6, 2021, knowing, at the time you entered the

6    Capitol, that you did not have permission to enter the

7    building?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  And did you, in fact, travel from

10    Colorado to Washington, D.C. and pick up Terry Lindsey, in

11    Ohio on the way, to attend a rally at the National Mall on

12    that day, January 6?

13           THE DEFENDANT:  I did, Your Honor.

14           THE COURT:  After the rally, did you walk with a

15    large crowd to the U.S. Capitol Building?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  And did you stand on the steps of the

18    Capitol for approximately one hour, in a restricted area,

19    knowing that you were not supposed to be on those Capitol

20    steps?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  And did you, in fact, then enter the

23    Capitol Building, at approximately 2:20 p.m., through the

24    rotunda door, on the southeast entrance, as part of the

25    large crowd or mob going into the Capitol Building?

1        THE DEFENDANT:  Yes, Your Honor.

2        THE COURT:  And was your purpose in standing on

3  the Capitol steps and entering the Capitol Building to

4  demonstrate and for what -- for the purpose of stopping

5  Congress from certifying the Electoral College vote for the

6  2020 presidential election?

7        THE DEFENDANT:  Yes, Your Honor.

8        THE COURT:  And when you entered the Capitol

9  Building and walked around, did you know you were not

10  supposed to be inside the Capitol Building?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  And while inside the Capitol, did you,

13  in fact, take a photograph of yourself and your codefendant,

14  Terry Lindsey, in front of a statute of Abraham Lincoln and

15  later share that photograph on social media?

16        THE DEFENDANT:  Yes, ma'am.

17        MS. WEST:  Your Honor.

18        THE COURT:  Yes, Ms. West.

19        MS. WEST:  I'm sorry to interrupt you.

20        I don't have some of the facts that you talked to

21  Mr. Croy about in the Statement of Offense; and perhaps I

22  have missed it.

23        I am specifically questioning the part at

24  paragraph 8, page 3, Glen Croy's participation in the

25  January 6, 2021 -- I don't see, in the statement of facts,

1    where it says a "restricted area"; and I did not, in fact,

2    speak to Mr. Croy about that fact.

3                THE COURT:  In terms of the restricted area on the

4    Capitol steps?

5                MS. WEST:  That's correct, Your Honor.

6                In fact, Mr. Croy has told me the opposite; that

7    there was nothing there that says it was a restricted area.

8                THE COURT:  Well, I think the whole area was

9    blocked off as a restricted area.

10                MS. WEST:  That could be.

11                THE COURT:  Mr. O'Connor.

12                MS. WEST:  That could be, Your Honor.

13                But with regard to Mr. Croy, in my conversations

14    with him -- two things that the Court asked about, one, the

15    restricted area -- he, in fact, told me the opposite; that

16    he did not know specifically that it was not -- that it was

17    a restricted area.

18                THE COURT:  Mr. Croy, when you were standing on

19    the Capitol steps, did you think it was okay for you to be

20    on the Capitol steps?  Or did you know it was a restricted

21    area?

22                THE DEFENDANT:  Your Honor, when I was on the

23    Capitol steps, there was so many people there I never saw

24    any signs or anything like that.

25                I did see the police up at the top of the steps;

1    but I was surrounded by, I don't know, thousands of people.

2    And, no, I didn't realize that, you know, I shouldn't be

3    there.  I didn't see any kind of signs or anything that said

4    that I shouldn't be there.

5              THE COURT:  So when you were standing on the

6    Capitol steps with this mob of thousands of people --

7              THE DEFENDANT:  I was not --

8              THE COURT:  -- you thought that was okay?

9              THE DEFENDANT:  Your Honor, I wasn't technically

10   on the steps; at first, I was down at the bottom.

11             And when I walked up -- when I first walked up to

12   the Capitol, there was a massive amount of people there.  I

13   had to go through a crowd to even get up to the bottom of

14   the steps.  I wasn't even on the steps, I was off to the

15   left of the steps.  But, yeah, at the time I did not know it

16   was okay.  I know now that it was not okay.

17             THE COURT:  Well, the Statement of Offense states,

18   Mr. Croy, that you were on the Capitol steps for about an

19   hour.  Is that not correct?

20             THE DEFENDANT:  Well, I was at the very bottom of

21   the steps.  I was not -- it's hard to tell because there was

22   such a huge crowd of people.  That was my very first time

23   ever in D.C.  So I don't -- you know, all this -- there were

24   steps going up to the grassy area; there were steps, you

25   know, going up to the Capitol.  There were steps -- you

1    know, so I mean --

2              THE COURT:  I am reading from paragraph 8:  The

3    defendant and Terry Lindsey stood at the steps of the

4    Capitol -- it says at the steps of the Capitol --

5              THE DEFENDANT:  (Unintelligible.)

6              (Simultaneous speaking.)

7              THE COURT:  -- for approximately an hour, before

8    they went inside the Capitol, at approximately 2:20 --

9              THE DEFENDANT:  Yes.

10             THE COURT:  -- by entering through the rotunda

11   door on the southeast entrance.

12             THE DEFENDANT:  Yes, ma'am.  We were -- I would

13   say we were at the steps; but I wasn't standing on the steps

14   itself for an hour.  We were kind of down at the bottom of

15   the steps, and to the left of there.

16             THE COURT:  And at that time, during that whole

17   period, for approximately an hour when you were standing

18   with this crowd at the steps of the Capitol -- what you are

19   saying here today under oath is that you did not know you

20   were not supposed to be there?

21             THE DEFENDANT:  No, ma'am.  I didn't see any

22   barriers.  In the walk up to where we stood, there was no

23   barriers.  It was such a dense crowd of people -- you know,

24   we were, like, weaving in and around people.  But I never

25   saw any kind of signs or barriers.  Like, I have watched

1    videos since then, and I never saw any of those barriers at

2    all.

3          When we got up there there was, like I said, an

4    immense crowd there already.  I didn't see -- you know, I

5    saw the police up at the top of the steps, so I knew then

6    that we couldn't go up there.  But, like, everybody was

7    around us; I didn't see any kind of signs or anything like

8    that.

9          THE COURT:  And when you went into the Capitol

10   Building, did you know you were not supposed to be entering

11   the Capitol Building, or you thought that was okay too?

12         THE DEFENDANT:  No.  I knew that I was not

13   supposed to enter the Capitol Building at that point.  I

14   mean, like I said, there was police at the top of the

15   stairs, so I knew --

16         THE COURT:  And were they saying anything or were

17   they just standing there?

18         THE DEFENDANT:  They were far away.  They were

19   shooting pepper balls at people and throwing grenades --

20   smoke grenades and gas grenades -- or whatever.

21         THE COURT:  And with all those grenades and the

22   fairly emphatic activity of the police at people around the

23   steps, that didn't give you a clue that you were not

24   supposed to be there?  You still thought it was okay to be

25   there?

 1            MS. WEST:  Your Honor, I think he just said he

 2    knew when he saw the police he wasn't supposed to be there.

 3            THE COURT:  That was going into the building,

 4    Ms. West.  This is --

 5            MS. WEST:  Yes, Your Honor.

 6            THE COURT:  He has said repeatedly here today that

 7    he thought it was okay to be at or on the Capitol steps.

 8            MS. WEST:  That's correct.

 9            THE COURT:  And so I am just asking him whether

10    having seen law enforcement taking fairly aggressive

11    action -- as you said, shooting grenades of some kind and

12    other activity -- towards the people coming towards the

13    Capitol, including on the Capitol steps, is it your

14    testimony under oath, Mr. Croy, that at that point you

15    didn't know you were not supposed to be there?  You still

16    thought because the mob was there you thought it was okay

17    for you to be there too?

18            THE DEFENDANT:  Your Honor, I have never been to a

19    rally or anything like that.  Yeah, I mean, when I was at

20    the bottom and they were shooting stuff down at people --

21    people were climbing up the rails of those steps, and they

22    were shooting at those people; and then, like, gas grenades

23    landed in the crowd.  I didn't know if it -- I mean, they

24    didn't hit me specifically; I wasn't hit.

25            You know, I knew that they were trying to repel

1    those people off of the rails of the steps, but I wasn't --

2    I had no idea -- I had never been to a rally; I had never

3    been to the Capitol.  I had no idea what door I was at.  I

4    had no idea of any of that stuff.

5            I just knew that everybody was there.  Everybody

6    walked from the Washington Monument up to the Capitol, and

7    we were walking with a huge crowd.  And, by the time we got

8    up there, we were just trying to kind of, like, wave our way

9    to the front.  I didn't see any kind of -- I didn't hear

10   anything like, you know, this is an unlawful assembly or

11   anything like that until later in the evening when I got an

12   alert that said that there was a curfew.  So -- and as soon

13   as we got that alert, we left.

14           So even with the smoke grenades and stuff -- I

15   watched stuff over the summer, you know, with, like,

16   protests and stuff; people get hit with, like, gas grenades

17   and stuff like that -- I had no idea.  I had never been to

18   D.C.; I had never been to a rally before.

19           THE COURT:  All right.

20           Mr. O'Connor -- okay.  Mr. O'Connor, can you just

21   state and describe the elements of the charge against this

22   defendant?

23           MR. O'CONNOR:  Yes, Your Honor.

24           And the charge that the defendant is pleading

25   guilty to is to entering into a restricted building in which

1     he knowingly entered the building for the purpose of

2     parading, demonstrating, or picketing in the Capitol

3     Building.

4          To the point Your Honor has been making, I think

5     if we were to proceed to trial we'd be able to offer

6     sufficient facts that would show that Mr. Croy knew or

7     should have know he wasn't -- he didn't have permission to

8     be in the restricted grounds, that is, at the steps leading

9     to the Capitol Building.  Understanding that this is a plea

10    agreement and that he is pleading to parading,

11    demonstrating, or picketing in the Capitol Building, we have

12    not proffered those facts in the Statement of Offense.

13         But for the purposes of the charge to which he's

14    pleading to, it is that he entered the Capitol Building

15    knowing he didn't have permission to parade, demonstrate, or

16    picket.

17         THE COURT:  All right.  Mr. Croy, do you feel that

18    you fully understand the charge to which you are entering a

19    plea of guilty today?

20         THE DEFENDANT:  Yes, ma'am.

21         MS. WEST:  Your Honor, I apologize.

22         I have -- and this Court knows how I respect and

23    have affection for this Court.  But I have an objection to a

24    fact that the Court stated that Mr. Croy was there knowing

25    that his presence was to -- I believe the Court said:  Stop

1    the vote of Congress.  I object to that.

2          My conversations with Mr. Croy were just exactly

3    as I said, about the steps that you made very good inquiry

4    on.  He had absolutely no intention of stopping any vote,

5    nor did he know that that is what was happening at that

6    time.  And so I would like the record to be clear that

7    Mr. Croy had absolutely no idea or intention to stop the

8    vote of Congress.

9          THE COURT:  But, Ms. West, this is the puzzle for

10   this petty offense charge that the government is offering in

11   this plea agreement; it's to parading, demonstrating, or

12   picketing; so that is typically for an end; it is

13   demonstrating about something; it's parading about

14   something; it's picketing about something.

15         So, Mr. O'Connor, what -- what -- this charge is

16   about parading, demonstrating, or picketing about something.

17         What is it that the government's position is about

18   what they were parading, demonstrating, or picketing about?

19         MR. O'CONNOR:  Your Honor, the government agrees

20   with you that the contextual facts indicate, by all means,

21   that that was the purpose of the parading --

22         THE COURT:  What was the purpose of the parade,

23   demonstrating, or picketing, Mr. O'Connor?

24         MR. O'CONNOR:  To obstruct the certification of

25   the election.

1                THE COURT:  Why isn't that in the Statement of

2      Offense?

3                MR. O'CONNOR:  Understood, Your Honor.

4                Largely because the element would go to an

5      obstruction charge, which many of Mr. Croy's co-rioters have

6      been charged with.  In the review of the investigation, if

7      that fact was not revealed to a degree, then the government

8      would prove it beyond a reasonable doubt in regards to

9      Mr. Croy.

10               Again, understanding that --

11               (Simultaneous speaking.)

12               THE COURT:  So it's the government's position

13     that -- so it's the government's position that people who

14     not only were at the steps watching law enforcement shooting

15     grenades and other things that Mr. Croy was an eyewitness to

16     it, saw but didn't relent and leave at that point but,

17     instead, went inside the Capitol Building to continue their

18     parading, demonstrating, or picketing from the restricted

19     grounds of the Capitol to inside the Capitol Building -- the

20     government's position, if I understood you correctly, is

21     that they would not be able to prove beyond a reasonable

22     doubt that their purpose in the parading, demonstrating, or

23     picketing by going inside the Capitol Building was to stop

24     the certification of the presidential election?  Really?

25     That's the government's position?

1          MR. O'CONNOR:  Your Honor, the government's

2    position is that, in the review of evidence I have uncovered

3    during the investigation, we have not found any direct

4    indication for that purpose in regard specifically to

5    Mr. Croy.  Noted that we agree with you contextually it's

6    apparent.

7          However, understanding that the government has to

8    proceed on the evidence that it has uncovered through the

9    investigation, we did not charge Mr. Croy with that element

10   for that charge -- with facts leading to that element for

11   that offense.

12         THE COURT:  Uh-huh.  All right.  So the parties

13   have submitted -- Ms. West, I understand your objection.

14         Mr. Croy answered the question; he knew why he was

15   there.  He knew why he was demonstrating, picketing, and

16   parading inside the Capitol Building; and he responded to my

17   question.

18         All right.  The parties have submitted this

19   written plea agreement letter.

20         Mr. O'Connor, does this plea letter reflect the

21   most lenient plea offer made to Mr. Croy in this case?

22         MR. O'CONNOR:  It reflects the only plea offer

23   made, Your Honor, which is the most lenient plea offer;

24   that's correct.

25         THE COURT:  All right.  And I understand, again,

1    it has a provision that I have been seeing in a lot of other

2    plea agreements entitled --

3              MR. O'CONNOR:  I guess, I would -- if it's okay,

4    Your Honor, I would just want to caveat my answer.

5              I understand other people charged with the Capitol

6    riot have pled to a condition that the government would not

7    seek -- it would seek only a probation sentence.  Mr. Croy

8    has not been offered that plea agreement.  Just so -- in

9    those regards, there are more lenient plea offers that have

10   been extended to participants in the Capitol riot.

11             THE COURT:  Yes.  I am not -- I mean, I wasn't

12   actually going to go there.  Although, I was going to point

13   out that I didn't see a recommend- -- a sentence

14   recommendation in this plea agreement; and I wanted to make

15   sure I didn't miss that.

16             Am I correct on that, Mr. O'Connor?

17             MR. O'CONNOR:  You are correct, Your Honor.

18             And the government will be asking for a

19   presentence report in order to better inform what a plea

20   recommendation from the government would be.

21             THE COURT:  And since this is a petty offense,

22   supervised release is not an option here even after a term

23   of incarceration.  You understand that, right?

24             MR. O'CONNOR:  Your Honor, if that's a question

25   for the government, yes.

 1          THE COURT:  Yes.

 2          Because, I mean, under a petty offense there are

 3     only two options that the Court can do:  Probation or a term

 4     of imprisonment with no supervision to follow.

 5          It's interesting because we're usually balancing

 6     safety to the community with some supervision after a term

 7     of incarceration, if there is going to be one.  And with a

 8     petty offense plea, if I accept this plea, it's -- there is

 9     no supervision that can follow.

10          And the government is fully aware of that?

11          MR. O'CONNOR:  Yes, Your Honor.

12          THE COURT:  Huh.  Okay.  Also, it has a provision

13     on cooperation with additional investigation, which is a

14     single sentence that:  Mr. Croy agrees to allow law

15     enforcement agents to conduct an interview regarding the

16     events in and around January 6, 2021, prior to sentencing.

17          So that interview has not yet taken place, is that

18     correct, Mr. O'Connor?

19          MR. O'CONNOR:  That's correct, Your Honor.

20          THE COURT:  And again, you know, I have asked this

21     in other cases:  This is not a normal cooperation agreement

22     that the government agrees to; is that right?

23          MR. O'CONNOR:  That's correct, Your Honor.

24          THE COURT:  And the restitution provision

25     estimates the damages to the Capitol Building -- at

1 paragraph 11, estimates that the damages to the U.S. Capitol

2 Building as a result of the events on January 6 is

3 $1,495,326.55.  And, as part of the plea agreement, Mr. Croy

4 is agreeing to pay restitution to the Department of the

5 Treasury in the amount of $500.

6    So, Mr. O'Connor, I did have a question about the

7 damages estimate because, typically, restitution encompasses

8 all of the -- all of the damages that are accruing due to

9 the conduct of a defendant in a criminal case.  And I think

10 Congress just passed legislation arising from the riot on

11 January 6th reimbursing the National Guard for $521 million

12 because the National Guard had to send 26,000 troops to

13 protect the Capitol due to the security concerns of all

14 these people -- these thousands of people Mr. Croy described

15 on January 6th.

16    So could you explain the U.S. Attorney's Office

17 reasoning to limit restitution to the 1 -- approximately, a

18 little bit less than 1.5 million cost of the repairs to the

19 building itself, when the total cost of this riot to the

20 American taxpayer is closer to half a billion?

21    MR. O'CONNOR:  Yes, Your Honor.

22    Certainly, you have seen other plea agreements, as

23 you have indicated, in this -- that this has become a

24 standard plea that some of my other colleagues have --

25    THE COURT:  I have only seen one other.

1              MR. O'CONNOR:  I apologize, Your Honor.

2              All to say that I am happy to get you that answer.

3              THE COURT:  Thank you.  I would appreciate that

4      answer in your sentencing memo in this case --

5              MR. O'CONNOR:  Yes, Your Honor.

6              THE COURT:  -- because I'm accustomed to the

7      government being fairly aggressive in criminal cases

8      involving fraud, you know, and other types of cases where

9      there have been damages that have accrued from criminal

10     activity where the restitution amount can be debated,

11     certainly disputed, by counsel as able as Ms. West.

12             But here we have Congress actually appropriating

13     all of this money due directly to the events on January 6th.

14     And I have found this damage amount of 1 point -- less than

15     $1.5 million -- when all of us American taxpayers are about

16     to foot the bill for close to half a billion, you know, a

17     little bit surprising, in terms of how the U.S. Attorney's

18     Office -- the Department of Justice is computing what the

19     restitution amount should be here.

20             MR. O'CONNOR:  Yes, Your Honor.

21             THE COURT:  I'm interested in your reasoning.  I

22     am interested in the reasoning.

23             MR. O'CONNOR:  Understood, Your Honor.

24             And I will certainly make sure to include that in

25     the sentencing memo that the government will provide.

1          THE COURT:  All right.

2          Ms. West, I usually turn to defense counsel, as

3    you are well aware, to summarize the terms of the plea

4    agreement; if you could do that now, although I have already

5    described the restitution and the cooperation term, such as

6    it is, in the plea agreement.

7          MS. WEST:  Yes, Your Honor.  Yes, Your Honor.

8          I mean, in sum, basically Mr. Croy has been

9    charged in a four-count information.  He is going to plead

10   to Count 4, as the Court has been discussing, and the other

11   three charges will be dismissed.

12         But, as far as additional terms to the plea

13   agreement, Mr. Croy has agreed and has made part of the plea

14   agreement the factual stipulation which is called the

15   Statement of Offense.  He is going to do an additional

16   interview regarding the events in and around January 6,

17   2021, prior to sentencing; that's found in paragraph 3 of

18   the plea agreement.

19         Additional charges will not be filed in this case.

20   And Mr. Croy agrees and acknowledges that the charges to be

21   dismissed at the time of sentencing were based in fact.

22         He will not be charged with any nonviolent

23   criminal offense in violation of federal or District of

24   Columbia law, which was committed within the District of

25   Columbia prior to the execution of this plea agreement.

1           However, the United States has expressly reserved

2      its right to prosecute him for any crime of violence, as

3      defined in 18 United States Code Section 16 or 22 D.C. Code

4      Section 4501 if, in fact, your client committed or commits

5      such a crime of violence prior to or after the execution of

6      this agreement.

7           Importantly, Your Honor, paragraph 5 sets out that

8      the sentencing guidelines in this case do not apply.  The

9      Court has already described that this is a petty offense

10     known as a Class B misdemeanor; accordingly, pursuant to

11     Section 1B1.9 of the U.S. sentencing guidelines manual, they

12     do not apply.

13          As far as reservation of allocution, the

14     government and the defense reserve the right to describe

15     fully, both orally and in writing, to you the nature and

16     seriousness of the client's misconduct, including any

17     misconduct not described in the charges to what Mr. Croy is

18     pleading guilty to, and to inform the presentence report

19     writer, you, of any relevant facts to dispute any factual

20     inaccuracies in the presentence report, and to contest any

21     matters not provided for in this agreement.

22          THE COURT:  All right.  I think, Ms. West, that --

23     I think that pretty much covers all of the salient terms,

24     unless there is something else that you want to add.

25          MS. WEST:  Just that you are not bound by the

 1      agreement; that the conditions of release are going to stay

 2      the same.  Mr. Croy is currently, as you know, not

 3      incarcerated.

 4              He has waived his venue, statute of limitations;

 5      and the Court has already explained the trial rights and the

 6      appeal rights, and collateral attack.

 7              And that's it, Your Honor.

 8              THE COURT:  Okay.  Thank you, Ms. West.

 9              Mr. Croy, do you have any questions about the

10      terms of the plea agreement before we proceed?

11              THE DEFENDANT:  No, ma'am.

12              THE COURT:  Do you understand that if the sentence

13      is more severe than you expected you will still be bound by

14      your plea, and you will have no right to withdraw it?

15              THE DEFENDANT:  Yes, ma'am.

16              THE COURT:  So, if I accept your guilty plea in

17      this case, the statute to which you are pleading guilty sets

18      the penalty you could receive as follows:

19              A maximum sentence of six months imprisonment;

20      and, as Ms. West said, and the plea agreement reflects --

21      since this is a Class B misdemeanor, the sentencing

22      guidelines do not apply.

23              In addition, since this is a petty offense, if

24      there is no prison term imposed here, you may be subject to

25      probation for a period of up to five years; and there is no

1    supervised release term that can apply to a petty offense.

2    So if you are sentenced to imprisonment you will then be

3    free of any supervision from this Court on this charge.

4          You would also be subject to a maximum fine of

5    $5,000, and a special assessment of $10 for the charge to

6    which you are entering a plea of guilty, and a fine

7    sufficient to pay the federal government the cost of any

8    imprisonment or period of probation.

9          Do you understand that those are the statutory

10   penalties that apply in your case?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Do you understand that, as part of the

13   plea agreement, you have agreed to pay restitution to the

14   Department of the Treasury in the amount of $500 for damages

15   done to the U.S. Capitol Building, to which your conduct on

16   January 6, 2021, contributed?

17         THE DEFENDANT:  Yes, ma'am.

18         THE COURT:  And do you understand that because of

19   your conviction you may be subject to forfeiture of property

20   sufficiently connected to your offense or proceeds derived

21   from your offense?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  In determining your sentence, I am

24   also obligated to consider other sentencing factors, under

25   18 U.S.C. Section 3553(a), which requires judges to consider

1    the nature and circumstances of the offense; your history

2    and characteristics, Mr. Croy; the need for the sentence

3    imposed to reflect the seriousness of the offense; promote

4    respect for the law and provide for just punishment for the

5    offense and to afford adequate deterrents to criminal

6    conduct; and protect the public from further crimes by you,

7    Mr. Croy; and the kinds of sentences available, and the need

8    to avoid unwarranted sentence disparities among defendants

9    with similar records to you who have been found guilty of

10   similar conduct; and the need to provide restitution to the

11   victims of the offense.

12           Do you understand I have to consider all of those

13   factors as well in determining how to fashion an appropriate

14   sentence in your case?

15           THE DEFENDANT:  Yes, ma'am, I do.

16           THE COURT:  Has anyone, your attorney, the police,

17   prosecutor -- any other person with whom you have come in

18   contact since you have been charged, promised or suggested

19   to you that merely because you are pleading guilty I will

20   give you a lighter sentence?

21           THE DEFENDANT:  No, ma'am.

22           THE COURT:  Has anyone forced, threatened, or

23   coerced you in any way into entering this plea of guilty?

24           THE DEFENDANT:  No, ma'am.

25           THE COURT:  Are you entering this plea of guilty

1    voluntarily and of your own free will because you are guilty

2    and for no other reason?

3              THE DEFENDANT:  Yes, ma'am.

4              THE COURT:  How do you plead to the charge of

5    Count 4 in the information against you; guilty or not

6    guilty?

7              THE DEFENDANT:  Guilty, ma'am.

8              THE COURT:  I am satisfied the defendant, Glen Wes

9    Lee Croy, is fully competent and capable of making a

10   decision today; and that he understands the nature of the

11   charges, the consequences of the plea.

12             I also find that the plea of guilty is knowing and

13   voluntary, he is acting of his own free will, and that there

14   is an adequate factual basis for this plea.  Therefore, the

15   plea is accepted; the defendant is now adjudged guilty of

16   that offense.

17             I would like to propose a sentencing date of

18   Friday, October 15th, at noon.

19             Counsel, would you please check your calendars for

20   your availability on that date and time.

21             MS. WEST:  Your Honor, I am supposed to be out of

22   the country October 15th.  I think it's probably going to be

23   canceled because of the variants going around.

24             THE COURT:  Well, shall we set this, Ms. West, and

25   then, if you cancel your trip, we can proceed.  If it's not

1    canceled -- I mean, if you need, we can push it -- we can

2    push it back to a later date when you get back?

3            MS. WEST:  Yes, Your Honor.

4            THE COURT:  All right.  Mr. O'Connor.

5            MR. O'CONNOR:  October 15th works just fine, Your

6    Honor.

7            THE COURT:  All right.  Good.  We'll set that

8    down.

9            All right.  I will allow Mr. Croy to remain

10   released on the same conditions on which he has been

11   released to date.

12           I do have to caution you, Mr. Croy, about your

13   activity and your conduct while you are awaiting sentencing.

14           You are required to appear for sentencing on the

15   sentencing date.  Failure to appear as required is a

16   separate criminal offense for which you could be sentenced

17   to imprisonment.

18           All of the conditions under which you were

19   released up until now continue to apply; and the penalties

20   for violating those conditions can be severe, including --

21   if you fail to appear for sentencing, you can be subject to

22   a fine or imprisonment; and that term of imprisonment for

23   your failure to appear can be consecutive to or, in other

24   words, piled on to any sentence you received for the offense

25   to which you entered a plea of guilty today.

1          If you violate the conditions of release, you can

2     be subject to revocation of the release and a separate

3     prosecution for contempt of court.

4          And if you are convicted of an offense committed

5     while you are released then, in addition to the sentence

6     imposed for that new offense, you may be sentenced for up to

7     one year.  Any term of imprisonment for an offense committed

8     while on release can be consecutive to the sentence received

9     for this offense to which you entered a plea of guilty

10    today.

11         Do you understand, Mr. Croy?

12         THE DEFENDANT:  Yes, ma'am, I do.

13         THE COURT:  All right.  Is there anything further

14    to address today from the government?

15         MR. O'CONNOR:  No, Your Honor.

16         THE COURT:  And Ms. West?

17         MS. WEST:  Just one thing, Your Honor.

18         I just want the Court to know that the prosecution

19    and I are working to get Mr. Croy's phone back to him that

20    was taken when he was arrested.

21         THE COURT:  All right.  Good luck with that.

22         MS. WEST:  Yes, Your Honor.

23         THE COURT:  I know there are a lot of phones in

24    the government's custody right now.

25         All right.  You are all excused.  Thank you.

1        MS. WEST:  Have a good afternoon, Your Honor.

2        THE COURT:  You too.

3        MR. O'CONNOR:  Thank you, Your Honor.

4        THE DEFENDANT:  Thank you, Your Honor.

5        (Whereupon, the proceeding concludes, 10:18 a.m.)

6                      * * * * *

7                      <u>**CERTIFICATE**</u>

8

9        I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
certify that the foregoing constitutes a true and accurate
transcript of my stenographic notes, and is a full, true,
10   and complete transcript of the proceedings to the best of my
ability.

11

12        PLEASE NOTE:  This hearing was held via
videoconference and telephonically in compliance with the
13   COVID-19 pandemic stay-safer-at-home recommendations and is
therefore subject to the limitations associated with the use
14   of technology, including but not limited to telephone signal
interference, static, signal interruptions, and other
15   restrictions and limitations associated with remote court
reporting via telephone, speakerphone, and/or
16   videoconferencing capabilities.

17

18        This certificate shall be considered null and void
if the transcript is disassembled and/or photocopied in any
manner by any party without authorization of the signatory
19   below.

20

21   Dated this 3rd day of September, 2021.

22

     <u>/s/ Elizabeth Saint-Loth, RPR, FCRR</u>
23   Official Court Reporter

24

25