## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-162(2) (BAH)** |
| | : | |
| **TERRY LYNN LINDSEY,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum.  Because of his aggressive conduct toward law enforcement officers, multiple unlawful entries into the Capitol Building, lack of remorse for his participation in the January 6, 2021 riot, repeated violations of the terms of his release, and substantial criminal history, the government requests that this Court sentence Terry Lynn Lindsey ("Lindsey") to one year of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Lindsey participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On April 5, 2022, just days before his jury trial was to commence, Lindsey pleaded guilty to three of the four counts of the Information: Count One, Entering and Remaining in a Restricted

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Building, in violation of 18 U.S.C. § 1752(a)(1); Count Three, Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 6104(e)(2)(D); and Count Four, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

A sentence of one year of imprisonment, with another year of supervised release to follow, is appropriate in this case because Lindsey: (1) was among a group of rioters that surrounded, taunted, and assaulted Metropolitan Police Department ("MPD") officers as they arrived to defend the Capitol on January 6, 2021; (2) apparently shoved an MPD officer during the scuffle; (3) climbed through metal scaffolding to be one of the first rioters to reach the Northwest Courtyard; (4) unlawfully entered the Capitol Building through the Senate Wing Door at 2:18 p.m., just five minutes after the initial breach; (5) proceeded toward the Crypt area of the Capitol Building while chanting, "who's house? Our house!"; (6) was part of the mob that overran and made physical contact with United States Capitol Police ("USCP") officers in the Crypt; (7) was forced out of the Capitol Building but remained on restricted Capitol Grounds for nearly 45 minutes, during which time he claims to have used controlled substances; (8) re-entered the Capitol Building through a different door amidst a mass of rioters who pushed past police officers who were attempting to keep them out; (9) evaded officers who were attempting to clear the area near the Rotunda doors and then entered the Rotunda; (10) took to social media shortly after the riot to celebrate his conduct and threaten that the "next time," he would return with guns; (11) lied to FBI agents about the extent of his criminal conduct on January 6 and repeatedly blamed law enforcement officials for his crimes by stating that he was unaware that his conduct was unlawful; (12) even after pleading guilty, has never expressed sincere remorse for his criminal conduct on January 6; (13) was arrested for driving under the influence of alcohol and without a license as many as two times

this year; (14) has continued to violate the law, and his terms of release, including by using alcohol and controlled substances as recently as last month; and (15) has a substantial criminal history.

In addition to these many aggravating factors, the Court also must consider that Lindsey was part of a large and violent riot that relied on numbers to overwhelm police officers who were guarding the Capitol Building on January 6, breach the Capitol, and disrupt the certification of the 2020 presidential election.  But for his actions alongside so many others, the riot likely would have failed to disrupt and delay the certification vote for several hours.  Here, Lindsey's conduct – including menacing, overwhelming and apparently assaulting officers, making two entries into the Capitol Building, and evading officers who had just cleared the Rotunda – combined with his lack of remorse, commission of other violations while on pretrial release, and celebration and endorsement of the mob's actions on January 6, 2021, renders a sentence of incarceration both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid repetition, the government refers to the general summary of the attack on the U.S. Capitol contained in the Statement of Offense.  *See* ECF No. 85 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Lindsey's conduct and behavior on January 6.

### Terry Lynn Lindsey's Role in the January 6, 2021 Attack on the Capitol

Prior to January 6, 2021, Glenn Wes Lee Croy and his girlfriend, Jennifer Horvath, picked up defendant Lindsey in Piqua, Ohio and they drove together to Washington D.C. to attend a political rally on January 6, 2021.  *Id.* at ¶ 8.  On that morning, Lindsey, Croy, and Horvath went

to a political rally at the Ellipse on the National Mall.  *Id.*  Following the rally, Lindsey, Croy, and Horvath walked with a crowd to the United States Capitol Grounds.  *Id.*  Lindsey, Croy, and Horvath stood on the West Lawn part of the Capitol Grounds, a restricted area, for approximately one hour as police officers engaged with them and other rioters and deployed tear gas.  *Id.* at ¶ 9. At approximately 2:00 p.m., Lindsey and Croy joined other individuals on the West Lawn who surrounded a group of MPD Officers, attempted to prevent the officers' access to the Capitol Building, and yelled at the officers.  *Id.*  The rioters, including Lindsey, surrounded and taunted the officers, accused them of being "oathbreakers," and implored the officers to retreat.  *Id.*



*Exhibit 1: Lindsey (wearing sunglasses), standing next to co-defendant Wes Croy (wearing grey sweatshirt), as the crowd surrounds and taunts MPD officers attempting to reach the Capitol Building.  The government intends to provide body-worn camera footage of this incident as Exhibit 2.*

During this incident, Lindsey was captured on an MPD officer's body-worn camera while yelling at the officers as the officers attempted to proceed through the crowd.  Footage from

another officer's camera appears to show Lindsey shoving an officer into the group of rioters.[2]
Although there is a significant amount of body-worn camera and open-source footage of the rioters
impeding and assaulting the MPD officers, the government located only one video, consisting of
just a few seconds, that appears to show a momentary assault by Lindsey of an MPD officer
believed to be Officer R.W., as shown below:



*Exhibit 3: Lindsey (wearing blue jacket) appears to push a uniformed MPD officer from behind as Croy (wearing grey sweatshirt) stands by.  The government intends to provide body-worn camera footage of this incident as Exhibit 4. Frame-by-frame images are included below as Exhibits 3A, 3B, 3C, and 3D.*

---

[2] The government first discovered this footage following the pretrial conference in this case.



*Exhibit 3A*



*Exhibit 3B*



*Exhibit 3C*



*Exhibit 3D*

At approximately 2:11 p.m., Lindsey climbed through metal scaffolding to get from the West Lawn to the Upper West Terrace area of the U.S. Capitol Grounds. *Id.* at ¶ 11.



*Exhibit 5: Lindsey climbs through metal scaffolding on his way towards the U.S. Capitol Building.*

Lindsey entered the U.S. Capitol Building at approximately 2:18 p.m. through the Senate Wing Door.  *Id.* at ¶ 12.  Lindsey later told family members that he "stormed the Capitol" and that the "cops let us in after they realized that they could not stop it."  *Id.*  As he entered, Lindsey joined the crowd chanting, "Whose House?  Our House."  *Id.* at ¶ 13.



*Exhibit 6:  Lindsey and Croy enter the U.S. Capitol Building through the Senate Wing Door at 2:18 p.m.*



*Exhibit 7:  Lindsey, shortly after entering the Capitol Building, chanting.  The government intends to provide video footage of Lindsey's entry into the Capitol Building as Exhibit 8.*

From there, Lindsey walked into the Crypt and joined the crowd as it overwhelmed officers

who were attempting to prevent the rioters from entering further into the Capitol Building.  *Id.*



*Exhibit 9:  Lindsey, standing among the rioters in the Crypt prior to the crowd overwhelming the officers and proceeding further into the Capitol Building.  Exhibit 8 includes footage from this incident.*



*Exhibit 10:  CCTV footage from the Crypt just before Lindsey and other rioters overwhelmed the officers.  Certain USCP officers are identified by red circles.*

While inside the U.S. Capitol Building, Horvath took a digital photograph of Lindsey and Croy in front of a bust of Abraham Lincoln entitled, "Lincoln the Legislator," which they later distributed widely to others.  *Id.* at ¶ 14.  In chilling cell phone video recorded by Croy around the time the photo was taken, members of the crowd can be heard yelling "come on, who's back there," "come on out," "it's our fucking house, not your house," "where's Nancy Pelosi," and "where's our votes."  *See* Exhibit 11 (to be provided to the Court).



*Exhibit 12:  Lindsey (viewer's left) and Croy (viewer's right) posing in front of the "Lincoln the Legislator" bust.  Lindsey posted this image on Facebook and sent it to friends and family members.*

After being ordered to leave the Capitol building by USCP Officers, Croy, Horvath, and Lindsey exited the building through the Memorial Door at approximately 2:37 p.m.  They had been inside the building for approximately 20 minutes at that point.  *Id.*  Once outside the Capitol Building, Lindsey, Croy, and Horvath remained on the grounds of the building for approximately 40 to 45 minutes.  *Id.* at ¶ 15.  During that time, Lindsey sent "selfie" photos taken inside the Capitol and messages to family members and friends boasting that "we crash[ed] the doors overtook the Capitol" and were "taking what's ours."



*Exhibit 13:  Lindsey sent messages to his family during his unlawful presence on Capitol grounds on January 6, 2021.*

At approximately 3:21 p.m., Lindsey, Croy, and Horvath re-entered the Capitol Building through the Rotunda doors.  *Id.* at ¶ 16.  Cell phone video taken by Croy shows the chaos at that location and time as a door alarm sounded and officers attempted to clear the Capitol Building. Clearly audible in the video is an individual stating, "they're pushing everybody out."  *See* Exhibit 14 (to be provided to the Court).  But Lindsey was not dissuaded.



*Exhibit 15:  Lindsey re-enters the Capitol Building.  The government intends to provide video footage of Lindsey's re-entry into the Capitol Building as Exhibit 16.*

Lindsey evaded a group of MPD and USCP officers who were attempting to clear the hallway outside the Rotunda and prevent rioters from re-entering the Rotunda.[3]  ECF No. 85 at ¶ 16.  Lindsey then entered the Rotunda before being forced to exit the Capitol Building again through the Memorial Door at approximately 3:29 p.m. *Id.*  But Lindsey's last photo from the Capitol was taken over 90 minutes later, after he had remained on Capitol grounds for a total of at least 3 hours.

---

[3] The government first discovered footage of Lindsey evading officers on about March 20, 2022.



*Exhibit 17:  Lindsey evading MPD officers as he enters the Rotunda.  The government intends to provide body-cam footage of Lindsey evading the officers as Exhibit 18.*

*Social Media Posts*

After the attack on the Capitol, Lindsey exulted.  At 6:49 p.m. on January 6, he told his granddaughter, "I feel great.  Proud to be part of history!"  Later that night, he told a friend that January 6 was "one of the best days of my life fighting for freedom.  I haven't felt this was [sic] since I was flying missions in the ARMY."  At 9:26 p.m., he boasted that he had used illegal substances during his time on restricted Capitol grounds, claiming, "I've smoked dabs and a bowl on the steps of the Capitol of the United States."  At 10:50 p.m., responding to a negative response to one of his Facebook posts, Lindsey stated, "hell yes I stand for the U.S. and next time we will bring are [sic] guns."

*Lindsey's Interview*

Lindsey agreed to an interview with the FBI at the time of his arrest.  During the interview, Lindsey deceived the officers and minimized his wrongdoing.  He claimed, "I didn't do anything wrong."  Exhibit 19, Clip 2 at 0:16.  Neglecting to mention the crowd taunting, assaulting, and impeding the officers on the West Lawn at 2:00 p.m. – not to mention his own apparent shove of

a uniformed officer – Lindsey falsely stated, "nobody around where I was at was doing anything but standing down there and minding … not minding our own business, but you know, screaming and chanting." *Id.,* Clip 4 at 1:14 - 1:35.

He repeatedly, and falsely, alleged that police officers permitted the rioters to enter the Capitol Building, either by abandoning their posts or standing aside as he and others calmly walked by.  He claimed that he "stood outside, peacefully, patriotically protesting until they opened the doors and let us in." *Id.* at 0:25 - 0:30.  Although video evidence, including Exhibit 8, plainly belies his statement, Lindsey told the FBI that, "by the time I got to the top of the steps, there were Capitol Hill police officers standing on each side of the door and the doors were propped open, letting us come on in.  So I went in." *Id.* at 0:34 - 0:45.  Asked whether the police pepper spray would lead a reasonable person to determine that they shouldn't be there, Lindsey stated, "well, when they stopped and opened the doors, you know, and were letting people come on up, basically. That's exactly what happened." *Id.,* Clip 4 at 0:53-1:05; Clip 5 at 0:12-end.  Lindsey then told the FBI agents that he suspected that police officers "set up" the rioters by using pepper spray to rile them up and then opening the doors to the Capitol.

Refusing to accept any responsibility for his conduct, Lindsey stated, "I don't feel I did anything wrong when they opened the doors and let us in like they did … Otherwise, I would have stayed outside.  … Stood outside and then gone home before the curfew."  Lindsey denied any knowledge that the crowd forced its way past the police – despite twice doing so himself.  Lindsey also deceived the FBI by omitting any mention of his re-entry into the Capitol Building.  When asked what he did after he left the Capitol Building, he truthfully stated that he stood outside near a space heater for around 45 minutes.  But Lindsey then claimed that he, Croy, and Horvath, "walked back the way we came in, and got an Uber, and went back to the hotel." *Id.*, Clip 10.

Video evidence – including cell phone video from Croy and CCTV footage – establishes that the trio actually pushed back into the Capitol Building and that Lindsey evaded police officers in order to proceed into the Rotunda.

*Lindsey's Conduct While on Release*

On February 27, 2022, Lindsey was arrested for driving under the influence, driving with a suspended license, and a stop sign violation in Miami County, Ohio. *See* PSR ¶ 81. As the Court recognized at his March 25, 2022 pretrial conference, Lindsey already has two DUI convictions, *see id.* at ¶¶ 52 & 57, among various other criminal convictions, but he did not tell Pretrial Services about his arrest. Lindsey also has not had a valid driver's license for a number of years but drove a vehicle despite *eight* prior arrests for driving without a license. *See id.* at ¶¶ 58, 64, 66, 70, 71, 73, 74, 79, & 81.

Despite the Court ordering him to abstain from the use of alcohol, narcotics, and controlled substances, *see* ECF No. 77, Lindsey tested positive for marijuana use on May 3, 2022, and tested positive for marijuana and alcohol use on May 27, 2022. PSR at ¶ 103. Lindsey, who boasted of smoking marijuana on the Capitol steps on January 6, 2021, admitted consuming two to three beers daily and one-quarter ounce of marijuana weekly until the time of his interview by the U.S. Probation Officer. *Id.* at ¶ 102.

Moreover, the government received information during the afternoon of June 30, 2022 that Lindsey may have had two additional interactions with law enforcement in the last few weeks: an arrest for driving under the influence of alcohol in Miami County, Ohio on June 22, 2022, and an incident on June 18, 2022 that led to his felony indictment on June 23, 2022 for unauthorized use of a motor vehicle in Shelby County, Ohio. The online indictment information for that case states that Lindsey does not live at the address provided by him to Pretrial Services in this case. This

16

information, if correct, suggests numerous violations of the Court's amended Order Setting Conditions of Release, since Lindsey was ordered to not violate federal, state, or local law; to advise the court or Pretrial Services of any change in residence; to abstain from alcohol; and to report, as soon as possible, every contact with law enforcement personnel.[4]  *See* ECF No. 77 at 3.

*The Charges and Plea Agreement*

On February 16, 2021, Lindsey was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On February 17, 2021, he was arrested at his home in Ohio.  On February 26, 2021, Lindsey was charged by four-count Information with the same offenses.  On April 5, 2022, just days before his jury trial was to commence, Lindsey pleaded guilty to three counts of the Information: Count One, Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Count Three, Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 6104(e)(2)(D); and Count Four, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Lindsey agreed to pay $500 in restitution to the Department of the Treasury.  ECF No. 84 at ¶ 13.

## III.    Statutory Penalties

Lindsey now has been convicted of 18 U.S.C. § 1752(a)(1), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement, the Submission by the United States in Support of Guilty Plea, and the U.S. Probation Office, Lindsey faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000 for Count One; and six months of imprisonment and a fine of up to $5,000 for Counts Three and Four.  Accordingly, the

---

[4] The government has not yet been able to determine whether Lindsey reported these law enforcement contacts to the Pretrial Services Office.

Court may sentence Lindsey to a maximum of two years in custody.  *See* ECF No. 69 at 2.  Lindsey also must pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As Counts Three and Four are Class B Misdemeanors, the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") do not apply to them.  *See* 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

The Guidelines do apply to the Court One conviction, however.  As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Gall*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.  *Id.* at 49.  The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.  *Id.* at 49.

The government agrees with the Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Lindsey's adjusted offense level under the Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2[5] |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |

---

[5] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. § 2B2.3(b)(1)(A)(i).  *See* PSR ¶ 41.  As indicated in the defendant's plea agreement, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. 2B2.3(b)(1)(A)(vii).  ECF No. 84 at 3.  On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting.  *See* 18 U.S.C. § 1752(c)(1)(B).  Because a two-level increase applies under either theory, there is no difference to the final offense level.

Total Adjusted Offense Level                                                   4

*See* PSR at ¶¶ 35-48.

The U.S. Probation Office assessed Lindsey's criminal history as a category I, which is not disputed.  PSR at ¶ 60.  Accordingly, the Probation Office calculated Lindsey's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months.  PSR at ¶¶ 48, 121.  Lindsey's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.  *See* ECF No. 84 at ¶ 5.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."  *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.  Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, cmt. 3.  More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.  *See* 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions,

> they deserve careful consideration in each case. Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one."

*Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation

of a sentencing range will 'reflect a rough approximation of sentences that might achieve §

3553(a)'s objectives.'"  *Kimbrough*, 552 U.S. at 89.

## IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing for all three counts of conviction also is guided by 18 U.S.C. § 3553(a), which

identifies the factors a court must consider.  Some of those factors include: the nature and

circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the

need for the sentence to reflect the seriousness of the offense and promote respect for the law,

§ 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the

need to avoid unwarranted sentence disparities among defendants with similar records who have

been found guilty of similar conduct. § 3553(a)(6).  The parties in this case have agreed that "*either*

*party may seek a variance and suggest that the Court consider a sentence outside of the applicable*

*Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to 18*

*U.S.C. § 3553(a)*."  ECF No. 84 at ¶ 6 (emphasis in original).  Here, as described below, the Section

3553(a) factors weigh in favor of a lengthy period of incarceration.

### A.  The Nature and Circumstances of the Offense

While each defendant should be sentenced based on his own conduct, each individual who

entered the Capitol grounds on January 6 did so as part of a larger crime to which his or her

personal conduct directly contributed.  Lindsey, who menaced law enforcement officers and twice entered the Capitol Building, by his conduct also aided and abetted those who entered the Capitol and committed other crimes.

While assessing Lindsey's individual actions, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged or engaged in violence; (3) whether the defendant encouraged or engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, deceived, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to his fair and just punishment.

In light of these factors, a sentence of one year in prison followed by a year of supervised release is warranted.  Lindsey entered the Capitol Building twice: first, just five minutes after the Building was breached on the west side, and then a second time at the Rotunda Doors on the east side, 45 minutes after he had been expelled by the police.  Lindsey pushed his way back through the Rotunda Doors while officers were attempting to clear the hallway outside the Rotunda.

Lindsey also was an active participant of a mob that impeded, taunted, and assaulted MPD officers as the officers arrived on Capitol Grounds to defend the building.  Lindsey himself appears to have shoved an officer at 2:00 p.m.  Lindsey was inside the Capitol Building a total of 27 minutes and had to be forced out of the building *two times* by law enforcement officers.  During

his second entry, Lindsey went to great effort to evade officers and enter the Rotunda.

Lindsey gloated in the hours after the Capitol riot that he felt "great," "proud," and it was "one of the best days of [his] life."  Lindsey even threatened that, "next time we will bring [our] guns."  Rather than express remorse for his criminal conduct or cooperate with the FBI, Lindsey claimed that he had done nothing wrong.  He deceived the FBI agents by stating that he did not engage in or witness any aggressive conduct towards police officers and falsely claiming that the officers stood aside and let the rioters enter the Capitol Building.  Lindsey also lied when he told the FBI agents that he, Croy, and Horvath went directly back to their hotel after spending 45 minutes on the restricted Capitol grounds – entirely omitting their re-entry at 3:21 p.m. and subsequent removal from the Rotunda.

Moreover, Lindsey has shown contempt for the law and this Court's authority – first by his fourth arrest for driving under the influence and his ninth arrest for driving without a license in late February; second, by his violations of this Court's conditions of release in May 2022, when he smoked marijuana and drank alcohol; and third, if he indeed was arrested for further DUI and unlicensed driving offenses over the past few weeks.

Accordingly, the nature and the circumstances of this offense establish the clear need for a lengthy sentence of incarceration.

### B.  Lindsey's History and Characteristics

As set forth in the PSR, Lindsey's criminal history consists of only one conviction that generates a criminal history point under the Sentencing Guidelines – a 2018 conviction for driving a motor vehicle while under the influence of alcohol and driving without a license.  *See* PSR ¶ 58. But Lindsey has been convicted on eight other occasions and his criminal history (as of the drafting

of the Presentence Report) reflects *21* additional arrests, including his DUI arrest in February 2022. *Id.* at ¶¶ 50-81.

While it is laudable that Lindsey twice enlisted in the United States Army, he eventually was discharged from service in lieu of a court martial; thus being discharged "under other than honorable conditions." *See id.* at ¶ 109.  Lindsey's status as a veteran, and his attempt to conflate military service with the crimes of the rioters on January 6, 2021, renders his conduct all the more egregious.  As a former military member, Lindsey was well aware that veteran status does not bestow upon a person the right to enter restricted government buildings or overrun uniformed officers.  His decision to impede, taunt, and apparently shove police officers and twice storm a guarded government building is nothing short of shocking in light of his former military service and training.  His repeated assertions that the officers opened the doors to the Capitol, let the rioters in, and even entrapped the mob, is belied by video evidence and insults the efforts of the dedicated officers who defended the Capitol Building on January 6, 2021.

Lindsey's extensive history of arrests and his cynical attempt to use his military service to deflect criticism of his conduct on January 6 show a clear need for the deterrent effect of imprisonment.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6]  As with the nature and circumstances of the offense, this factor supports a

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption

of probation. I think the presumption should be that these offenses were an attack on our

democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the general need to deter crime,

and specific deterrence, or the need to protect the public from further crimes by this defendant. 18

U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly

every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January

6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss

during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

---

Oversight and Reform Committee (June 15, 2021), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters – especially those who intend to improperly influence the democratic process – that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Lindsey's unabated disdain for the rule of law and this Court's authority demonstrates the need for specific deterrence. Lindsey impeded and apparently assaulted officers on January 6. He unlawfully invaded the Capitol Building twice, yelling out with his fellow rioters that the Building was "our house," helping them overwhelm officers in the Crypt, and then, when thwarted, went right back into the Capitol and evaded officers attempting to clear the Rotunda hallway. Lindsey lied to the FBI by alleging that law enforcement officers entrapped the rioters and stood aside, permitting the mob's entry into the Capitol Building. He failed to truthfully describe his own conduct, and that of others. Lindsey is a recidivist who has been arrested dozens of times and has previously been convicted of offenses including battery, obstructing a police officer, use of unlawful substances, driving under the influence of alcohol, and driving without a license. He was alleged to be driving under the influence of alcohol for a *fourth time* and driving without a license for the *ninth time* just days after the pretrial materials were due in this case. And, despite being directed by this Court that he must not use alcohol or controlled substances, Lindsey has continued to drink alcohol and smoke marijuana, twice testing positive last month. As described above,

25

information recently discovered suggests even more arrests and violations of the terms of Lindsey's release in the last few weeks.

As of the date of this filing, Lindsey still has not expressed remorse for his conduct.  To the contrary, he waited until just days before trial to enter a guilty plea.  Even then, he has failed to meaningfully take responsibility for his actions and has violated the express conditions of his post-plea release by repeatedly using alcohol and controlled substances.  Lindsey's guilty plea should not be taken as evidence of a change of heart, or a recantation of his vow that "next time we will bring are [sic] guns."  The evidence of his guilt is overwhelming, and that he had little realistic possibility of an acquittal at trial.  Through its sentence, the Court should send the unmistakable message that the Capitol Building is *not* Terry Lindsey's house, open to his entry whenever he is unhappy with the results of a national election.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assaults on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not  become

---

[7] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

the default.[8] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-97 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that.  Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment.  Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences – such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), and whether she destroyed evidence of his participation in the breach – help explain

---

[8]   Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-97(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-165 (TSC), *United States v. Douglas K. Wangler*, 1:21-cr-365 (DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).   The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.   Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

A sentence considerably more serious than that imposed in the case of co-defendant Wes Croy is appropriate.   For Croy, the government recommended a sentence of two months of incarceration and this Court imposed a 36-month term of probation including 14 days in a residential reentry center.  *See United States v. Croy*, No. 1:21-cr-162(1), ECF No. 58.  It is true that Croy traveled with Lindsey to the rally on the ellipse and accompanied him for most of the day on January 6, 2021.  But that is where the similarities end.  Croy has a much less extensive criminal history and engaged in significantly less egregious conduct than did Lindsey on January

6 and since.  The government has no evidence that Croy pushed an officer, used illegal substances on Capitol grounds, evaded officers during his second entry into the Capitol Building, misled the FBI during his interview, committed offenses during the pendency of his case, or violated the terms of his release.  Croy did not threaten to return, armed, to the Capitol.  He also entered a prompt guilty plea, to just one Class B misdemeanor, acknowledged his conduct, provided truthful information in his interview with the FBI, and took responsibility for the entirety of his actions.  Indeed, Croy identified his own girlfriend, Jennifer Horvath[9], as an individual who accompanied him into the Capitol Building on January 6.  This is in stark contrast to Lindsey's conduct, which warrants a lengthy sentence.

In formulating its sentencing recommendation for Lindsey, the government considered the more analogous cases of Dennis Sidorski and Robert Maurice Reeder.  Sidorski pleaded guilty to one count of 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct at a Restricted Building.  *See United States v. Sidorski,* No. 1:21-cr-48 (ABJ), ECF No. 42.  In that case, the government recommended a sentence of one year imprisonment (the statutory maximum), one year of supervised release, 60 hours of community service, and $500 restitution.  *Id.* at 1.  The Court sentenced him to 100 days' incarceration, one year of supervised release, a $4,000 fine, and $2,000 in restitution.

Sidorski, like Lindsey, traveled to the Capitol Building after attending the "Stop the Steal Rally."  *Id.* at 10-11.  He, too, joined the group of rioters impeding and menacing MPD officers at approximately 2:00 p.m. as the officers arrived to help assist the USCP.  *Id.* at 11-14.  Somewhat similar to Lindsey's apparent shove of an MPD officer, Sidorski put his hand on an MPD officer's

---

[9] Jennifer Horvath has been charged with the same four offenses as Lindsey.  Her case currently is pending before this Court.  *See United States v. Horvath*, No. 1:22-cr-192 (BAH).

arm and shoulder during that incident.  *Id.* at 12.  Sidorski unlawfully entered the Capitol Building

through the Senate Wing Door around four minutes before Lindsey.  *Id.* at 15.  Both Lindsey and

Sidorski were part of the mob that overwhelmed U.S. Capitol Police Officers in the Crypt – in fact,

they both can be seen in the same video just prior to the crowd's surge.  *Id.* at 17.

Sidorski's situation varied in other respects.  Lindsey was inside the Capitol Building for

27 minutes, while Sidorski was inside longer – approximately 37 minutes, including six minutes

inside the suite of offices of the Speaker of the House.  *Id.* at 15-18.  Unlike Lindsey, Sidorski left

the Capitol Building at 2:51 p.m., apparently of his own volition, and did not re-enter the building.

*Id.* at 18.  While he obstructed the investigation of his wrongdoing by throwing away a sweatshirt

and deleting his Facebook account, Sidorski did not mislead the FBI and had expressed remorse

since his actions on January 6, 2021.  *Id.* at 23, 26.  Moreover, Sidorski's criminal history and

compliance with the terms of his pretrial release were much different.  Sidorski's criminal history

consisted of just one misdemeanor conviction for driving under the influence of alcohol, and, other

than some traffic citations, he did not appear to have had any contact with the police since 2004.

*Id.* at 24.  The government submits that its recommendation in that case – one year of imprisonment

– is an appropriate benchmark for the Court to consider here.

Similarly, the government recommended the statutory maximum sentence, six months'

imprisonment, for Robert Maurice Reeder.  *See United States v. Reeder*, No. 1:21-cr-166 (TFH),

ECF No. 33.  Reeder pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building,

a violation of 40 U.S.C. § 5104(e)(2)(G).  *Id.*  On the day of the sentencing hearing, the government

was made aware of additional unlawful conduct – that Reeder had grabbed and pulled an officer

to the ground.  *Id.*  After a continuance, the government asked the Court to impose a sentence of

six months' imprisonment.  *Id.* at 2.  The Court sentenced Reeder to 90 days imprisonment and

$500 restitution.  *Id.*, ECF No. 41.

Other than the late discovery of seemingly assaultive conduct toward officers, Reeder is most similar to Lindsey because he entered the Capitol Building twice on January 6, 2021.  *Id.*, ECF No. 26 at 8.  Like Lindsey, he also misled the FBI during a voluntary interview and falsely blamed officers for his unlawful conduct.  *Id.* at 42-47, 52-55.  He told the officers, "it's almost like they wanted us to come in there and they closed the doors and then they have their sound bite for the news, you know … That was kind of a plan to allow people in and then drop them and then, you know, demonize the Trump people."  ECF No. 26 at 12.

But there are differences as well.  Reeder pleaded guilty to just one Class B offense.  He entered the building at approximately 2:31 p.m., around 13 minutes after Lindsey, and through an interior door.  *Id.* at 7; *see also id.*, ECF No. 19 at ¶11.  He does not appear to have been one of the rioters who overwhelmed officers in the Crypt, had no prior criminal history, *id.*, and entered a prompt guilty plea, *id.*  He apparently was compliant with the terms of his release.  During his time in the Capitol Building, Reeder encouraged others that they should not destroy anything.  ECF No. 26 at 9.

Unlike Croy, Sidorski, Reeder, or any defendant known to the government, Lindsey pleaded guilty to three misdemeanor offenses, on the eve of trial, shortly after evidence of his apparent assault on a police officer was discovered.  Lindsey also has violated the law and his conditions of release while charged in this case and claims to have used illegal substances while on restricted Capitol grounds.  He entered the Capitol twice, pushed past police, screamed and chanted during his 27-minute presence in the Capitol Building, lied to the FBI, and has expressed no remorse for his conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently – differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  *Id*. at 1095.

## V.    Conclusion

For the reasons set forth above, the government recommends that this Court sentence Terry Lindsey to one year of incarceration, one year of supervised release, and $500 in restitution.  Such a sentence reflects the seriousness of Lindsey's criminal conduct on and since January 6, and promotes respect for the rule of law and the Court's authority that he has thus far flouted.

<div style="margin-left: 40%;">

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

</div>

By:    */s/ Jordan A. Konig*
         JORDAN A. KONIG
         Trial Attorney, U.S. Department of Justice
         Detailed to the U.S. Attorney's Office
         For the District of Columbia
         P.O. Box 55
         Washington, D.C.  20044
         202-305-7917 (v) / 202-514-5238 (f)
         Jordan.A.Konig@usdoj.gov